The next case call is People vs. Glazier. Counsel, whenever you're ready, you may proceed. May it please the court and counsel, my name is Jean Park and I represent James Glazier. James Glazier had just turned 17 years old at the time of this offense, and he was sentenced to 60 years in prison, which is the maximum for first degree murder. Since he's serving his sentence at 100% time, he'll be 77 years old when he's released. Today, I'll be focusing my argument on the insufficiency of the evidence, the excessiveness of his sentence, and the ineffectiveness of counsel. Does it make any difference that this was a result of a plea negotiation? That it was a result? It actually was not a plea negotiation. My understanding is that in order to avoid any consecutive type of sentence, it was a first degree and a stipulated bench trial to preserve, right? It was a stipulated bench trial and not a plea, and actually the judge made it very clear several times that this is not a plea in any way, nor is it tantamount to one, and they only stipulated... Let me rephrase my question. It was strategic to avoid a longer sentence, wasn't it? The parties agreed to a sentence of 60 years. Right. That's what I unarticulately asked the question. It was a strategic maneuver in order to avoid a longer sentence. They had a recommendation for 60 years, yes. Right. Okay. Does that make a difference in your argument? No, it doesn't. Okay. Okay, so just to start, James's first degree murder conviction, it should be reversed where the state failed to prove beyond a reasonable doubt that he had the specific intent to kill Sidney Stevens. Now, once the charges were all amended, he was only charged with one count of first degree murder, and that count read, and I quote, on or about July 18 or 19, 2010, without lawful justification and with the intent to kill Sidney Stevens, the defendant strangled Sidney, thereby causing her death. So therefore, in order to prove that James acted with the intent to kill, the state had to prove beyond a reasonable doubt that it was his conscious objective or purpose to kill Sidney. Here, the facts will show that James did not have a specific intent to kill Sidney. Just looking at his interview with the police, it's very clear that he was extremely scared of Carl Dane, who was the mastermind behind this offense, and he's the one who shot Sidney four times. James is literally sobbing throughout the entire interview, and he repeatedly makes sure that the police are 100% sure that Carl is in jail, there's no way he can hurt him, and it's only once he's sure of that that he talks and he says that it was clear that it was Carl's plan to kill Sidney, and actually Carl continuously threatened to shoot him on the spot if he didn't cooperate or if he ever talked about what happened, and Carl actually had a semi-automatic gun on him at the time. He pointed it at James several times as he told him exactly what to do. Now, once they were at Sidney's home, James was still acting under the gunpoint from Carl, and James said he knew that if Sidney's mother were to wake up, that Carl would kill her, because Carl had said, leave no witnesses behind. So basically, James did everything he could to try and keep Sidney quiet. He wanted her to stop moving and yelling so as not to wake up the mother, and so James said that he put his arm around Sidney, but he did it in a way so that she could still breathe. Sidney ended up passing out. That was confusing. She could still breathe, but she passed out. She did end up passing out, yes. That's pretty tight squeezing. He said he tried to do it in a way so that she could breathe, but that is what happened. When you choke somebody, is there intent to harm them, potentially kill them? Is there the actual intent when you're choking somebody? Yeah. Well, given how he was charged, which requires the actual intent to kill, it has to be his objective and purpose to try and kill her, but given the circumstances, I would say that since he's under gunpoint, and he's saying that he's doing what he can to just try and get her to stop moving and yelling, and he's basically afraid for his life, I wouldn't say that he had the actual intent to try and kill her at that point. Did the indictment say intent to kill or otherwise cause great bodily harm? It did. It specifically said. So we have the alternative. It said intent to kill or cause – no, it just said intent to kill, sorry. It just said with the intent to kill Sidney Stevens, the defendant strangled her, thereby causing her death. So given the circumstance, going back to what happened, Sidney did pass out, and then once they were outside, Sidney woke up again and started yelling again for her mom. So at that point, James as well as Robbie, who was a 15-year-old who was involved in this offense, held her down again. She passed out, and then they drove to a bridge in town. At that point, Carl, again at gunpoint, told them to take Sidney out of the car, and at that bridge it was when Carl was the one who shot Sidney four times in a row, and then again at gunpoint told James and Robbie to then kick her in. So based on these facts, it's clear that James didn't have the specific intent to kill as he was charged because it wasn't his conscious objective or purpose to kill her. He was, as I said, acting under gunpoint. He's afraid for his life that if he didn't do what Carl said, he would be shot right then on the spot with the gun that Carl had. Was that raised as a defensive trial, compulsion? Compulsion? Compulsion was not raised as a defensive trial. It actually is not, can't be raised as a defense to murder, but given that this is requiring a specific intent to kill, intent can be inferred from, it's a state of mind, so it can be inferred from the circumstances. So compulsion can be considered as a factor to see what was James' state of mind here, and he was acting, I believe, under the threat of imminent harm or death, considering that he's at gunpoint. So based on all of these factors, we would argue that James didn't have the specific intent to kill Sidney, and therefore the state failed to prove his guilt beyond a reasonable doubt, and this court should reverse his conviction. Now moving on to sentencing. Despite James' role in this offense, where he was a secondary player, James got the maximum of 60 years. He just turned 17, and he'll be 77 when he's released, which is basically the rest of his life in prison. We would argue that this sentence is excessive for several reasons. First of all, given his youth. Just 10 days prior, James had turned 17, and also it's excessive given, in light of recent U.S. Supreme Court decisions, that said that children are constitutionally different than adults. It's also excessive given that James has absolutely no prior criminal history. This is his first offense. And also looking at his role in the offense here, as I discussed, he was a secondary player. This was not his idea, and he was operating basically under gunpoint. And again, it's also excessive because of his strong potential for rehabilitation here, especially given his young age. We believe that he could still be restored to be a productive member of society, given that he was just 17 at the time. But not only was the sentence here excessive, it was also problematic in that there was really no sentencing hearing, even though it was a stipulated fence trial, and it wasn't a guilty plea. So just to clarify as to what happened that day, prior to the stipulated fence trial, the state amended the counts down to one count, first degree murder. And then the judge told James, okay, now you're eligible for 20 to 60 years, which is the range of first degree. And then the stipulated statement of facts, just the stipulated statement of facts, they didn't stipulate to the sufficiency of the evidence to convict, were read into evidence, and then it was the judge himself who then found James guilty. And as I said, the judge then clarified, this isn't a guilty plea, nor is it tantamount to one. But at the same time, at sentencing, the judge just adopted the party's agreed upon recommendation for 60 years, which is the maximum. And it's important to note that since this wasn't a negotiated guilty plea, the 60-year recommendation is just that. It's a recommendation at this point. So the judge still had discretion, if he wanted, to impose a lesser sentence. And the problem here is that none of the mitigating factors were considered, and there basically wasn't a sentencing hearing where the judge just adopted the 60-year sentence. Why wouldn't the judge have the discretionary authority to do exactly that? Why wouldn't he have? Yeah, I mean, the judge, Judge Campanella, could either say, consider your recommendation. I'd like to hear more, both in aggravation and mitigation. Or the judge can say, under the circumstances and with the dismissal of other counts, that's reasonable, and I will go along with it. Why wouldn't the judge have the discretion to go either way? The judge does have discretion to go either way. But with this case, I think given just the unique facts here, given that he's only 17 and he's basically been given a de facto life sentence, we would argue that the judge, given that he had discretion, he could have at least, if he had heard some of the mitigating factors that may have influenced his decision, which leads me to the ineffectiveness of counsel. Whereas the judge had the right to adopt that sentence if he wanted. Counsel is the advocate here for James, and counsel should have done what he could have done in order to at least get it out there. He's preserving this on appeal here, so at least do things such as have James give a statement of allocutions. He actually told James, you don't need to give one, don't give one, and he advised him not to. And he said, well, it doesn't actually make sense because we're going to be back here in appellate courts. I'd rather you not give a statement. Well, first of all, wouldn't that particular statement and the fact that the trial counsel had basically done what, in his thought, was the best deal he could work out out of an absolute disaster, isn't that a consideration of trial strategy? Why wouldn't it be overall trial strategy as opposed to ineffective assistance of counsel? I've got the best deal I can in this disaster. Don't open your mouth. We're going to take it. Don't screw it up. I would argue that it actually is ineffectiveness. It wasn't trial strategy to agree to the sentence that puts his client in prison until he's 77. I mean, this is a situation where he's, like I said, he's 17, and so to agree to the maximum, I think even though it was counsel, counsel had this agreed recommendation, but at the same time, it wouldn't have hurt in any way to at least put some mitigating factors out there for the judge to hear. Because, as I said, it's still up to the judge's discretion. It wasn't a guilty plea here. What if presenting mitigating factors would have caused the state's attorney to say, that's not our deal, we're going to go ahead and do whatever? Well, at that point, the judge had already found James guilty, and they were now at the sentencing portion. And so given that at that point the charge had already been reduced to the one count, I don't think that, I mean, at that point, I think it wouldn't have, my point is that counsel should have advocated for his client in whatever way he could. And I think it would have been, it was objectively unreasonable for counsel just to not present any mitigating factors, such as the fact that he doesn't have a criminal history here, or that he's only 17, or the potential for rehabilitation, or just looking at the role of the offense again. Despite the fact that there is this recommendation for 60 years, it's not a guilty plea here, because it's a stipulated bench trial. The judge had discretion, along with counsel, to try and do what he can to advocate for his client. And in my opinion, as for advocating for his client, it would have been to present some mitigating factors, to have him give a statement of allocution, just so the judge can hear his, whatever James wants to say at that point. Because if the point of the stipulated bench trial is to try and preserve things for appeal, he couldn't have gotten more time at that point. I mean, he got the max of 60 years. It wouldn't have hurt him, necessarily, to try and advocate for his client. And on top of that, counsel also didn't file a motion to reconsider sentence, either. So I think, given all of those factors, we would argue that counsel, really, here, failed to advocate for his client, and his actions really were objectively unreasonable, and it ended up prejudicing James. And really, when you look at everything, the bottom line here is no matter how you look at it, 60 years served at 100% time for a 17-year-old juvenile, it's a lengthy sentence. It's an effective life sentence, and we would argue that it's excessive. So therefore, we ask that this court reduce his excessive sentence, or in the alternative, remand for a new sentencing hearing, given counsel's ineffectiveness. Just in conclusion, we would ask that this court reverse James' murder conviction, since he did not have the specific intent to kill as he was charged, pursuant to the first argument. And as for James' sentence, we would ask that this court reduce or remand for a new sentencing hearing. As for my other arguments, I stand on my briefs, and unless there's any further questions. I have. I'm sorry, go ahead. Did I interrupt you, Judge? No, not at all. Go ahead. One of the things that you haven't addressed that has concerned me in this case is these mandatory sentences that were discussed by the Supreme Court, where a juvenile is mandatorily sentenced to a term without any options in the sentencing court. And in Illinois, of course, we have for 17-year-olds, I think now 18-year-olds, a mandatory transfer to the criminal courts if the individual is charged with any felony. Is that correct? Yes, that's correct. So if an individual 18 or younger is charged with theft over $300, that person is going to get automatically transferred to the criminal justice court, the circuit court. Is that my understanding? Yes, under exclusive jurisdiction. Basically, if you are 17 years old and charged with a felony, then you will automatically be sent to adult court and be faced with adult sentencing. Okay, you've said sent to adult court and be faced with adult sentencing. Yes. Those are two separate issues. Well, just by virtue of being sent to adult court, they're subject to the adult penalties. Do you see any difference that's prejudicial to a juvenile in being sent automatically to a circuit court? I mean, is there any disadvantage to the individual who is sent automatically to a criminal court as opposed to staying in a juvenile court where the judge has some discretion on whether to transfer that individual? Definitely. Why is that? I think there's a lot of implications by automatically sending a juvenile to adult court. And that was actually the crux of my argument in argument two, which I didn't address today. But basically, the problem is, as you pointed out, it's automatically sending all 17-year-olds convicted of felonies to be sentenced to adult prosecution and sentencing. And I think the main problem there, especially given the recent Supreme Court cases of Miller v. Alabama, Granby, Florida, and Overby v. Simmons, the main problem there, I would say, is that they're being automatically sent there without any sort of consideration as to their youth or its attendant characteristics. And as the Supreme Court's pointed out, children are just constitutionally different than adults in many regards, such as their maturity, their potential to be influenced by peer pressure, their lack of ability to take themselves out of horrific crime-producing situations such as this. So their youth and the characteristics aren't looked at at all. And then, as I was saying, by changing the venue to adult court, they're automatically subject to greater adult penalties. Like, for example, here with first-degree murder, they're automatically subject to 20 to 60 years for first-degree murder, whereas if they were in juvenile court, their only possibility is to be incarcerated until they're 21 or having a possibility of a state adult sentence. So definitely there's a greater... So I see that there's disadvantages to sentencing, but how about procedurally? Is there any criminal procedure that would be prejudicial to an individual who's automatically transferred to the criminal court that you could think of? I mean, they still get their Miranda rights. They may not have a juvenile officer present. Okay? Something like that. Is there any difference procedurally that you can iterate? I'd probably say the largest difference procedurally is just not taking into consideration their youth and their individual circumstances, because in juvenile court, that's considered. Those factors are actually looked at. Actually, in the Illinois Juvenile Court Act, in its non-automatic transfer provision, it actually directs...the statute directs a judge to consider factors like... Go ahead, please. ...health, adequacy of the punishment, services for the juvenile, likelihood of rehabilitation. So all those factors that I mentioned that weren't considered in this case with James Glaser, if it wasn't automatic, the juvenile court, the judges actually has to consider those factors first. So I think that by...that is procedurally a difference. By moving them to adult court, that isn't considered, and they're just automatically, regardless of their situation, they're automatically treated as adults subject to adult penalties. Thank you, counsel. Okay. Thank you. Thank you. Counsel? May I please court? Counsel? My name is Sharon Panaghan, and I represent the people of the state of Illinois. I'd like to start out with Issue 2, which we were just discussing with counsel for the defendant. We could spend the entire 20 minutes talking about this issue, and I'd be glad to do so if that's what you want. But the parties have already presented this court. We have, I counted them this morning, over 50 pages of argument, plus hundreds of pages of journal articles and so forth. So I'd like to summarize the state's position very briefly, and then if you have any further questions, I'd be glad to address them. In People v. JS, the Illinois Supreme Court addressed this precise issue and rejected any constitutional right to be tried in juvenile court. Was that before or after the recent Supreme Court? It was before. Right. That was before the U.S. Supreme Court dealt with sentencing issues. Right. There was sentencing issues. The question, but the important part of JS is that JS says there is no right, to even have juvenile court. That's what JS says. There is neither a common law nor a constitutional right to adjudication under the juvenile court. We have one, but to say that there is a constitutional right to have a juvenile court, it's not there. That's what JS says. Now, the defendant in their reply brief says that the state has ignored Miller, Graham, and Roper and relies on state court opinions that predate them. That's certainly not true. In fact, the state cites decisions from every single district in the state of Illinois, including this district, post Miller, post Roper, post Graham, that have concluded that those Supreme Court cases do not change the fact that excluded jurisdiction provision does not violate due process. What do you think is the difference, though? And this is the trouble I'm having. Why is it different for sentencing than it is for charging? We charge somebody, if we charge them with a felony over $300, and I'm just taking a minor felony, for example, and they're automatically swept mandatorily to the circuit court. But yet when we get to sentencing, the U.S. Supreme Court says, oh, no, you can't have a mandatory system like that. You can sentence them, you know, you can give them the max, but you have to have all these other considerations. So I'm trying in my head to figure out why do we draw a distinction between the charging phase and the sentencing phase? What we draw a distinction between is whether there is a due process right, a constitutional right, to even be in juvenile court. That's the distinction. If there's no constitutional right to even be in juvenile court, then you can't. The effects that flow from that still allow or are still constitutional. The defendant says that when this happens, you can't take into account the defendant's age and his prior history, and I said, well, of course you can. Not if he's charged at 17. And at 15, if he's charged with murder, it's automatic too, right? I believe it's 17 and 18 for murder. I'm not going to commit myself. Regardless, I understand your point about you're not entitled to a juvenile court, and yet our system of justice in Illinois has created one. So does that give them a vested interest? Not when you look at the reasons that the legislature created the juvenile court and why they passed the Extended Jurisdiction Act, which was that it recognizes that juveniles, especially older juveniles, and especially charged with the most heinous of crimes, murder, there's a growing population that fall under this group, and there is a consensus by the legislature that these juveniles are not entitled to the protections of the Juvenile Court Act. This is not certainly something that Illinois is alone in, as noted in our brief. Most states that have statutes like this consider this to be an appropriate disposition, and the legislature has looked into this and said, okay, we're going to create the Juvenile Court Act, but we don't have to give it to just anybody. We have decided that these juveniles, because they are older juveniles, because they are charged with murder, are not entitled to that protection. And I do want to, one other point that I'd like to, and I'm sure this court knows this, but the Illinois Supreme Court has taken People v. Pacheco, which is one of the many, many, many cases that have concluded that post-Grover, post-Graham, that the Illinois statute is still valid, and it has taken that case. I checked this morning. They have not conducted oral argument yet, so it will be a while before the Supreme Court issues its decision, but I do think it is compelling that there's no brief, I mean, there's no case cited in defendant's brief that says this is wrong. The most you can come up with is the dissent of Pacheco. Every district, every district. Go ahead. But the Pacheco case now is assimilating the Juvenile Court Act to a constitutional right. I mean, we're now saying there is some constitutional basis for making sure that these factors are considered, that this mandatory charging is not appropriate. Do you read the dissent that way? Oh, the dissent? Yes, the dissent. I'm sorry. I'm sorry. I read the Pacheco that way. No, you read, well, you read one. I'm reading the dissent. Well, a dissent is just not a dissent. I understand, but you seem to be now talking about this whole constitutional. The dissent is, but that still begs the question of all the other cases that are out there that said there's no due process right to be in juvenile court. We're not talking about sentencing. We're talking about venue. And all of, and this is not, I mean, this is decades of case law, not just in Illinois, but even J.S., the cases that it relied on to say there is no due process right are the same cases that Roper relies on, but makes no effort to, I mean, it doesn't overrule the cases that J.S. relied on. It affirms them. And it points out the fact that, I mean, the J.S., that leads to a greater conclusion that J.S. remains good law. If Roper intended to go farther than it does, it wouldn't be, it would have said so. It would not be sub silentio overruling decades of nationwide case law that deals with sentencing. All of them deal with sentencing. This case doesn't deal with sentencing. The Extended Jurisdiction Act doesn't deal with sentencing. Any more questions on that issue? Can we agree to disagree? Oh, absolutely not. I think you've made a very good argument, actually. As far as the sufficiency of the evidence, the defendant may not have wanted to kill Sidney, but he certainly intended to. When Carl called him up, he said, let's go for a drive. We're going to go kill Sidney. And he went with it. He entered Sidney's home alone, unlocks the door, lets in Carl Dane and Robbie Mueller. He jumps on Sidney, puts his hand over her mouth, puts a choke hold on her. He defines his action as a choke hold. And as you can tell, I don't know how you choke someone and expect them to keep breathing. He choked her until she passed out. He dragged her unconscious body outside. The defendant, in reply, said, well, she did regain consciousness one time. And he's absolutely right. She did briefly regain consciousness just outside the house. But you know what happened? The defendant jumped on her, held her down, covered her mouth so tightly with his arm, his arm went numb. And then she, I love this, went back to sleep. She wasn't asleep. She never regained consciousness after that. And the defendant believed that when they got to the bridge, she was already dead. Carl fired again. We don't know what happened with that because the defendant didn't watch. And the body was so badly decomposed that nobody knows whether she was shot or not. And in fact, one of the most gruesome parts about this murder is that she actually may have drowned, laying face down in the mud in a creek, unconscious. So the defendant must be presumed to intend the natural and probable consequences of his act and evidence that he committed a voluntary and willful act, such as putting someone in a chokehold, until they pass out, pass out, and I'm putting that in my own air quotes, has a natural tendency to cause death. And that's sufficient to prove his act. Now, Justice Cates, you brought up something that I wanted to emphasize, which is that this was a stipulated bench trial. The defendant was specifically told that he could raise any defenses at the stipulated bench trial. The affirmative defense of compulsion was not raised at the stipulated bench trial. And furthermore, compulsion is generally not available for murder. But here's the thing I think is the most important that just blows this compulsion argument out of the water, is that the defendant had not one but two opportunities to get out of this whole thing. First, they arrive at Sidney's house. Everybody in the house is asleep. What's James' job? It's to go climb into the house, break into the house, and then come down to the basement and let Carl and Robbie in. What could he have done at that time? He could have awakened the family. He could have called the police. He could have just refused to let Carl and Robbie inside. There is no compulsion there. There's nobody holding a gun on him there. He was safe. He could have saved Sidney's life right then and there with no danger to himself whatsoever. He didn't do that. He went downstairs. He lets the man who said he came there to kill Sidney, he lets that man into the house. He didn't have intent to kill before. He had it then. Then he puts this chokehold on Sidney, and he says, well, I didn't do that to kill her. I did that because I didn't want her to wake up her mother. And Carl said he wouldn't leave any witnesses. Well, if the defendant cared about Tracy, the mother, or Sidney, he wouldn't have let Carl in the house. Well, I guess isn't really the real point is he would have never been there to begin with, because the whole purpose, the whole plan from the get-go was to kill her. Absolutely right. So when he agreed to be part of that plan— Absolutely right. Absolutely right. And the thing is, yes, Carl had a gun. A great deal of the time, Carl had a gun in his pants. A great deal—there were times when Carl threatened to use the gun. He particularly, when you read the transcript of the interview, he particularly threatened if they told afterwards. That was his big threat, so I'm going to tell that. He did—probably it was the primary time when James says that Carl pointed the gun at him was when they were at the creek. He says he pointed the gun at him to take the body out of the car. Well, there's a good chance she's dead already then. And Carl then puts the gun away to help take her out of the car. But in any case, Justice Chapman has hit the nail on the head, which is he went there to kill Sidney. There was another time that the defendant could at least have motivated things, and that's after he choked her that first time and he went to get the car. Here again, he's gone. He's away from this poor old man, Carl, and he's in the car. He can, again, go to the police, do something. If Sidney had obtained medical assistance at that time, who knows? She could have been— And the other thing I need to point out about this whole compulsion thing is when you read the defendant's first interview with the police when he wasn't a suspect, you see an entirely different version of this horrible, mean man. I mean, James says, oh, I'd take a bullet for Carl. We're tight friends. He said, we never keep anything away from each other. And here's, I think, a very telling thing. He says he and Carl hate snitches. And then he says Sidney snitched on him, on James, not Carl, but on him. So to say that the defendant is so afraid of Carl, when you look at that first interview with him, I just am dubious of the whole thing. Was the ineffective assistance of counsel brought up at trial, post-trial motion, as a preserve? So it's a plain error issue? Well, I don't know that ineffective assistance of counsel needs to be raised in a post-trial motion, especially since— That's true. I embarrassed myself. I'm sorry. No, you're absolutely correct. But it does seem odd to me that a defense lawyer bargains for 60 years. A defense lawyer whose point was facing natural life imprisonment plus several mandatory consecutive sentences on top of that. And the thing is, if you look at the three hearings, July 12th, July 17th, and July 30th, the 60-year sentence and the dropping of all the other charges went hand-in-hand. Defense counsel says that he thinks they'll be presenting to the court as a stipulated bench trial. That's on the 12th. Then on the 17th, defense counsel says that they're having discussions with the state and hammering out a stipulation. And then on the 30th, the day of the stipulated bench trial, and the day that the charges are modified. They don't drop these charges until the stipulated bench trial is a done deal. But what was he facing with these other charges? I mean, 60 years on 77—getting out at 77 years of age is— You think 77's that old? 77's older than any member of this bench. A little bit, yeah. Plus, he hasn't done any time, so he's had a presumably less stressful life. Essentially, it is a life sentence. Yes, that's kind of my point. But the point is, you have a life sentence. I mean, a life sentence plus a mandatory consecutive on top of that, versus an opportunity to have some time after the sentence. And that's—Justice Chapman, you said he's facing— Let's go over here for a second. That he's facing— That's okay. He was a friend. He was a friend. That's fine. You said the same thing. This is strategy. If you're faced with natural life plus several mandatory consecutive on top of that— Or roll the dice. Or roll the dice. I know what I'd choose. You have a chance of walking out of prison someday. And given the fact—I mean, I don't know if you've had the opportunity to read the defendant's interview or not, but there's— Of course, this goes to the sufficiency of the evidence, and the counsel for the defendant will say this is not true. To me, you read that interview, there's little doubt that this man was going to be convicted of all of these charges. Sixty years is better than natural life plus mandatory. Any questions? I've already gone over. I don't think so. Thank you, counsel. Counsel? Before I let you start, I have a question. Yes. Because it hasn't been discussed yet, and Ms. Shanahan kind of ended with it. What about this statement that was given? Was it voluntary? When the people come in and say, well, to the mother, we may let you see your son, but let's set up a brand-new tape recorder, and he's already invoked his right to have an attorney. All of that was brought up in the motion, and the court denied all of that? Well, we looked at his interview extensively, and we would say that his rights were given, and it appeared to be a voluntary statement. Okay. So just to— I do have a question about the compulsion factor. Where's the compulsion when he knows going into it that the intent is to kill this girl? I think the—well, just to clarify that, he was—James never agreed to go and kill this girl. Basically, when they're in the car, Carl tells them, this is what's going to happen. We're going to go take Sydney and kill her. He has the gun, and he basically—James says, and I quote, he said, if we ever talked, he's going to kill us. And if we didn't cooperate, he'd shoot us on the spot. And Carl actually had this gun out. It wasn't in his pants. It was out several times. It was out at Sydney's house. It was pointed when he said to take her out of the car, pointed again at the bridge. This gun was out. So that's where I'd say the compulsion comes in, in the sense that he's operating under gunpoint here. He's terrified for his life, and moreover, there was no chance for him to get up. There wasn't—the door was already unlocked. It's probably a matter of seconds before the other two are in the house. He actually lives with Carl. I think he's at this point terrified out of his mind that he has a gun. He knows what he's capable of. It's not the situation where he could have gone out, gotten out of it, or he agreed to do this. I mean, the gun is out basically the whole time. And as for the quote regarding the snitches, James actually specifically says in regards to—he said that about snitches generally. But as for this specific instance, he said, I didn't want anything done about that. I didn't know Carl was going to actually kill her. But he lives with Carl? He lived with Carl at Carl's grandfather's house. And that's part of the record. It's in the interview. Yes, it is. And just in regards to—earlier in the argument, touched more on some of that, argument two on the Miller factors. The cases such as J.S. and so forth, we have to remember these are 20 or 30 years ago. And Miller was decided in 2012. And these cases were decided without the benefit of these recent Supreme Court decisions. And Miller—despite there are cases, yes, that go against it. But recently, Miller has been applied to cases that go to sentences like here, where it's not mandatory life without parole or the death penalty. Actually, in State v. Knoll, State v. Ragland, which are Iowa cases, it was applied to a lengthy term of your sentence, such as 52 1⁄2 years. Such as in Ragland, it was 60 years. These have been applied. It's being extended. And also in regards to it not being a sentencing statute, it has also not just been limited to the Eighth Amendment at this point. It's been applied elsewhere. The Illinois Supreme Court applied Roper analysis in a Parental Notice of Abortion Act case. I'm sorry, the parental— Notice of Abortion Act case in Hope Clinic for Women v. Flores. The U.S. Supreme Court applied Miller and those factors to a Fifth Amendment case in J.D.B. v. North Carolina. Let me ask you this. The Juvenile Court is a creature of statute. The legislature decided to alter the—amend the Juvenile Court Act as far as these mandatory transfers are concerned. Does Miller affect that? Does Miller affect— Again, do the U.S. Supreme Court cases affect the constitutionality of doing that? Of the mandatory transfer. I know you're talking about sentencing. I want to move over to the idea of mandatory transfer, which the legislature decided to amend the Juvenile Court Act to include. Do these Supreme Court cases, in your opinion, affect that? Yes, I believe they do affect that. In regards to transfer, the main problem here is the automatic transfer of all of these juveniles regardless of their youth and attendant characteristics. And that's just what has to be considered. So I believe it does impact that. And actually, it was the Miller Court that specifically in their brief, they acknowledged disapprovingly that Illinois is just one of 14 states that puts juveniles accused of homicide in adult court automatically with no apparent opportunity to seek transfer to juvenile court. So I would say, yes, it definitely applies in that aspect. So you're saying that because it's automatic as opposed to discretionary as it was prior to that, there's a constitutional infirmity. Definitely. The automatic nature for all 17-year-olds is what is the issue here. And it's not only excessive, but it's unconstitutional. I'm sorry. Go ahead. Oh. Your time is up. Never mind. Okay. I don't think we have any further questions. Thank you. Thank you. We appreciate the briefs and arguments of counsel. Everyone did an extraordinary job. We will take the case under advisement. There are cases on our docket, but not for oral argument. The court is adjourned.